May it please the Court. My name is Cliff Gardner. I represent Petitioner Lyle Menendez. As the Court knows, in order to avoid duplication, the two petitioners in this case filed a joint opening brief. We'll try to take the same approach here at our argument. I'll be using ten minutes of the time. Mr. Gibbs, my colleague, will be using his ten minutes. I'll be addressing issues relating to the admission of the Ozeal tape, the Ake v. Oklahoma issue. Mr. Gibbs will be addressing the issues regarding the instructional issues and the Brooks v. Tennessee issue. And for my ten minutes, I'd like to reserve three minutes for rebuttal, if I can, Your Honor. Starting then with the Ozeal issue, there is a – there are a great number of issues I'm sure the Court is aware from reading the brief on which my colleague from the Attorney General, Mr. Byrne, and I disagree. But as to this issue, I think the facts that govern the issue, at least the existence of error, are not in dispute. And I think it's a useful place to start because there is so much in dispute. The first issue we agree on is that shortly after the homicide, the two brothers hired Attorney Gerald Chalif, a local prominent criminal defense lawyer. And he, in turn, some months later, hired Jerry Ozeal, a psychiatrist, to assist him in the case. And in fact, there's a trial court finding that Mr. Chalif hired Mr. Ozeal precisely so that Mr. Ozeal could assist him in preparing a penalty-phase defense, should it come to that, as it turned out, of course, it did come to that. That was consistent with Mr. Chalif's testimony, and that indeed was not only the trial court's finding, but the prosecutor's position at trial was that, as the prosecutor argued forcefully in his closing argument, the purpose of that meeting was for them to prepare a legal defense. The second point that we agree on is that shortly before that December 11th meeting – and that's what we're talking about, is the admission of the December 11th tape Shortly before that meeting occurred, Mr. Chalif, Dr. Ozeal, and the two brothers met. And Mr. Chalif, in his testimony, talked about what he told the brothers, about whether that was confidential, what they said to Dr. Ozeal would be confidential. And this is at the excerpt of record at page 385. He told them that everything they told Dr. Ozeal was privileged, and he explained why. He said, quote, because he was there in the capacity of assisting me in relation to what we were doing. Ozeal was helping Chalif prepare for the defense of the case. And the third point we agree on is that ultimately, Ozeal's statements were used in the prosecutor's case in chief. The statements the two brothers made – Mr. Chalif may have been optimistic. Apparently he was, Your Honor. I mean, I don't mean to sound cynical about it, but sometimes lawyers take a guess at what the law is going to be, and they give advice, and they turn out to be wrong. And maybe this is just one of those cases where Mr. Chalif reasonably, perhaps, and I'm sure reasonably and certainly in good faith, gave advice to his client, which the state courts then, you know, didn't – you know, it turned out not to be a correct prediction of state law. It happens all the time. It happens in tax law. It happens in securities law. It happens in contract law. And indeed in criminal law. As you must know, it happens in criminal law. It happens to me all the time, Your Honor, in criminal law. But let me say this, that Mr. Chalif may indeed have been incorrect about state law, but that's not what we're here about. The state court finding that this was not covered under the state's attorney-client privilege is not something I can relitigate here, much as I might like to. I cannot relitigate that. What I can litigate is whether this was covered – whether this kind of confidentiality between the psychiatrist and the two brothers is something that was anticipated to be covered by Aik, Smith, and Powlick. Smith v. McCormick and Powlick v. Wood, this Court's precedents. Basically, you're claiming denial of Aik rights. And to win on that, you have to claim the – you have to persuade us that confidentiality of communications is part of the right guaranteed by Aik. That is exactly my position. And let me – That's two steps removed from Aik. Well, let me do that, then. Let me take those steps. The question is, as Your Honor points out, or perhaps not explicitly, but implicit in the question, is Aik doesn't say anything about confidentiality. So how can I be arguing – It doesn't really even say anything about a right to a psychiatrist. Well, let – It says the state has to pay for it. And we can infer that the Supreme Court wouldn't be requiring the state to pay for it unless you have a right to it. So I think that first step is a pretty easy step. Well, then let me take that easy step, that baby step. And, in fact, this Court took that easy step in Powlick v. Wood in footnotes. I think – I think that's a step you're going to have more trouble with. Okay. Well – But the next step is harder. I don't think it is. And here's why. I understand the Court's concern. Aik doesn't say anything about confidentiality. Aik talks about the basic tools of a defense. It talks about providing a psychiatrist that can provide – or that can perform an appropriate examination, as the words of Aik. And the question is, where is confidentiality in that? Where is that? And here's where I think it is. And where is confidentiality as expressed by the United States Supreme Court? In Aik, yes. No, I understand the concern. And I'll do my best to get to it, because here's where – In the language of Aiptbach. Well, and certainly I want to talk about Aiptbach in a moment, because I'm not sure that that's the right way to talk about Aik. There are two possibilities that Aik could mean. One is that, in talking about the basic tools of an effective defense, the basic tools that a lawyer needs, and we're going to provide you with that, a defense psychiatrist, whether as Pallack says, you're rich or poor, you're entitled to that basic tool. Could Aik possibly have meant that what you were entitled to as a tool of a basic defense is a psychiatrist whose statements – to whom you make statements that are not confidential? Could that be what the Supreme Court was saying? Yes, we know you need basic tools. And we know a psychiatrist is a basic tool. And the basic tool we're going to provide you is a psychiatrist that after you talk to him, he's going to go down the office from the psychiatrist examination room, and he's going to go to the prosecutor's room, and he's going to tell him what you said. Well, sometimes the statements are confidential, and sometimes they aren't. For example, the client goes into the psychiatrist's room and says, I plan to kill the prosecutor tomorrow, and I've hired my brother to do it. Now, the psychiatrist says, oh, that's confidential. I'm going to go play golf. Heck no. Under California law and under law, they've got a responsibility to go right down and blow the whistle on the plot. So sometimes they're confidential, sometimes they aren't. When was the first time the December 11 tape surfaced as a courtroom evidentiary issue? It was – in the first trial, it was litigated. Who put it into evidence? Well, after the – the answer to your question is the defense did. The defense did. Yes. But it's – What we're – what we're talking about now is the use of that in the second trial. No, that's not really what we're talking about, because you've got to look – Sometimes things are confidential, and sometimes they aren't. I can't disagree with that. Okay. Okay. But let me – let's look at the context of how that was put into evidence at the first trial. It was only put into evidence at the first trial after the Court ruled that attorney-client didn't apply. So the idea – State law. Well, the State law privilege, and of course the Federal component, was never addressed by either the State court or the State court of appeal. We'll talk about that in a minute, I suppose, in the context of AEDPA. But in terms of – Powlick v. Wood talks about losing the confidentiality for statements made to a psychiatrist, and Powlick says if you put your mental state at issue through expert testimony, then of course you can lose that – the privilege that AIC provides. Powlick assumed that AIC provided a privilege, as did Smith v. McCormick make the same assumption. But that didn't happen in this case. This wasn't a case where someone weighed the costs and benefits and said, you know what, we're going to put this at issue. We know that this will then open up the AIC confidentiality, because the Court had already ruled that AIC provided no confidentiality. That there was going to be no confidentiality, that this was coming into evidence. So this isn't a situation where a lawyer makes the – But if it was coming into evidence, that doesn't necessarily mean that your client had to put it into evidence. Well – It's a choice. Yes, but it's a forced choice. The analogy that comes to my mind is the choice that the Supreme Court talked about – Well, I guess the law – everything the law requires is forced. Well, let me refer to the Court – I understand what you're talking about as a trial tactic. But in a legal matter, I don't think it was forced. I think it was. And here's what I'll suggest that the Court could benefit from looking at Harrison v. United States. That's the Supreme Court decision involving confessions. And they say, look, a forced confession came in. The defendant responded to that by testifying in order to take the sting out of it and explain it. And then at the next trial after the conviction was reversed, the question was, could you use that? And the answer was no, because he wasn't acceding to the ruling. He was doing his best to respond to an erroneous ruling. That's exactly what we have here. That's what the lawyers were doing. They were doing their best. It was coming in. So they did their best to respond to it. Yeah, but you're dealing with – what you're dealing with in the first situation there is a forced confession. There's a forced confession. There's a forced confession. And here you've got statements to a psychiatrist deemed under state law not to be privileged  Well, I don't think it is, because as the prosecutor told the jury many times in closing argument, this was a confession. It was a confession that shouldn't have come in because it was confidential. And it was only when the trial court erroneously ruled that it wasn't confidential that they then put it in to take the sting out of it. It's precisely the situation – in terms of the waiver analysis, which has a – The trial court erroneously ruled that it wasn't confidential? Under the Fifth and Sixth Amendments, yes. The state law privilege I'm not arguing about. What I'm saying is that under A, it was privileged. The trial court's ruling that it wasn't privileged, which then led defense counsel to put it in, is the erroneous ruling that's analogous to the erroneous ruling in Harrison. The state has never even argued that there's some kind of waiver here, that what we're really talking about is the use of the first trial. No, I'm talking about really what you said, that it's confidential, it's confidential, it's confidential. Well, it turns out that many things that you may have thought were confidential turn out not to be. In the first trial, it was your side that made the decision whether to call it forced or not, to put it in the public field. Well, it's not your position that confidence means it can never be disclosed. Even attorney client confidences can sometimes be disclosed if you claim ineffective assistance. That's correct. That is not my position. Your position is that you need a minimal amount of confidence to have the relationship exist at all. And indeed – Yes. And I'm suggesting there was no waiver at the first trial because they only put it in after the eighth – The state hasn't claimed the waiver. And they have never claimed waiver. Indeed, that's why I'm suggesting. I think this is why, because they understood that, indeed, the whole reason that it was put in initially was because the trial court had already ruled there was no privilege. If you were to look, I think, at footnote – But we're not really at waiver. We're not saying there's a privilege and then  stage deciding whether confidentiality of the relationship is a integral part of having a right to a psychiatrist. And let me go back – I mean, what if the state said, yes, sure, you can have a psychiatrist under AIC, but there's got to be a policeman present? That's no psychiatrist at all. That's no defense tool. That's not what AIC was talking about. When I, as a defense – How do we know that? Well – How do we know that? That the state can't say, okay, you know, fine, the Supreme Court says you're entitled to a psychiatrist, but we're going to put a reasonable limitation on it. And the reasonable limitation is you can do it in the presence of a detective. Or the presence of the prosecutor, yes. I think we know that from two reasons. One, I think we – the first is the language of AIC. AIC talks in fairly ringing terms about the use of a defense psychiatrist, the need for a defense psychiatrist to assist defense lawyers in assessing mental state. And there's three different purposes. One of the purposes is to prepare – help the defense lawyer prepare for cross-examination, just as Marshall says. One of the purposes is to serve possibly to testify. And one of the purposes is simply to examine the defendant. You cannot consult with defense counsel and help him prepare defenses if the psychiatrist is going to the prosecutor's office right after he leaves the psychiatric office. That cannot be what the majority – the basic tool that the majority in AIC was talking about was we'll give you that basic tool. We know it's important. Is your argument basically that nobody would ever use a psychiatrist if that were the case? I'm a defense lawyer. I could never tell my client, you know what, we need a psychiatrist, but you can't talk to him. Because if you talk to him, he's going to go to the prosecutor's office. It's a policy matter. What defense lawyer in their right mind would seek assistance under those conditions? To understand your position correctly, your position is that not to give a basic right of confidentiality nullifies AIC. Well, that's exactly what this – Because it would never be used. And it's exactly what this Court said in Smith v. McCormick. You do something, you so limit the right that the efficacy of the tool is gone. And that's exactly – you know, had AIC not involved a measure, a core measure of confidentiality, Smith v. McCormick and Powlett v. Wood would have been easy cases. They wouldn't have had to talk about what you have to do to waive the statements to the prosecutor because – to waive the statements you made to the psychiatrist because, indeed, those statements weren't confidential to begin with. You've not only plowed through your time, you've now chewed into the whole counsel's time. We'll give you a little more – not much more. But I just want to make sure this doesn't move on. Can I just ask one question? Of course. Do you understand the holding of AKE or AIC to be rather narrow? An indigent defendant is entitled to have an expert psychiatrist provided to him when, quote, the defendant has made a preliminary showing that his sanity at the time of the offense is likely to be a significant factor at trial, unquote. Okay. There's two components, I think, of the question. No, I don't understand it to be so narrow, and I don't think this Court did in Powlett v. Wood. If you look at footnote 7 in Powlett v. Wood, they took the step that – That's this Court. I'm after what the Supreme Court said. Well, I – It seems to me that it relates to a showing of sanity at the time of the offense is likely to be a significant factor at trial. I don't think AKE was meant in any way to be so limited. I think what it means is that if you are entitled to the tools you need to be an effective lawyer, and in that case it involves sanity, but if it involves mental – any other mental issues. So you're taking it to the next level. You're trespassing now on Teague. I don't believe I am. Teague certainly hasn't been raised in this case as a defense, and I think for good reason. I don't think I'm taking it to any level that it wasn't already taken in Smith v. McCormick and Powlett v. Wood, and that is when mental state is an issue, a defense lawyer cannot – I cannot do my job unless I have help, and that's what AKE was about. That deals I think with the sanity issue, and indeed that's the way AKE's been construed across the country. It hasn't been limited to sanity. The second part of the question gets to the first step you were talking about is the difference between rich and poor. In Powlett v. Wood at footnote 7, this Court was fairly clear in saying rich and poor has nothing to do with it. If you're entitled to it, you're entitled to it not only to be appointed if you're poor, but if you're wealthy as well or indeed middle class. It just doesn't matter. I know I've gone way over my time. Any other points? I did want to just mention one thing about Section 2254, the applicability. Our position, of course, we agree on at least the predicate, and that is there has to be an adjudication on the merits for 2254D to apply. And where we disagree is whether the State Court adjudicated this on the merits. If you take a look at how this was raised in State Court, it was raised under separate arguments, one as a State law privilege and two as the AKE Fifth Amendment, Sixth Amendment issue. The State Court of Appeal did indeed address the State law to any client privilege. It said not a word about the AKE claim. I'm not talking about not citing AKE because I know under Early v. Packard that's not going to do it. They didn't say a word about it. Early v. Packard does indeed stand for the proposition that when a State court addresses a claim, it doesn't have to cite any particular case if it addresses a Federal claim. It doesn't have to say any magic words. But this Court said no words at all, much less magic words. This is not a case where the State is entitled to the litigation benefit of 2254. They did not face this issue. Because in your view, they did not address the AKE claim at all. They didn't say a word about it, Your Honor. So I've trespassed on everyone's time so far, and if I could have a moment or two of rebuttal. Thank you, Your Honor. Larry Gibbs Good morning, Your Honors. May it please the Court, I'm Larry Gibbs. I represent Eric Menendez. Eric Menendez We'll give you four ten minutes. Larry Gibbs Thank you, Your Honor. Eric Menendez Since we took four ten minutes. Larry Gibbs Appreciate it. I intend to discuss the failure of the trial court, refusal of the trial court to instruct the jury on the theory of defense in this case first, and if there is time left over, turn to the Brooks issue for a few moments. Like the previous issue, there are certain things that we agree upon in connection with the instruction of defense, the failure to instruct on the defense. Number one is that imperfect self-defense was the sole defense that these defendants, my client, put forward. Number two, for the better part of five months, they put together the case, they tried the case on a theory of imperfect self-defense. The constitutional right to have that available, it goes entirely out of state law. It's because state law allows this defense. Larry Gibbs The right to imperfect self-defense? Eric Menendez There's no federal right to have a ---- Larry Gibbs The right, that's correct, Your Honor. The imperfect self-defense is a creature of state law. Eric Menendez State law allows for this, and once state law allows for this, they're entitled to an instruction supporting it. Larry Gibbs That's correct. Once you have the source of ---- Eric Menendez What about these findings by the state court that wasn't, you know, you have to have some sort of threshold showing in order to be entitled to an instruction. You can't just say, well, okay, now I want an alibi instruction. Larry Gibbs For example. Eric Menendez For example. You have to come forward with something. Larry Gibbs That's correct. And state court here said there wasn't enough. Eric Menendez Let me say two things about that. First is for ---- Larry Gibbs You think that's what the state court said? Eric Menendez The state court said that there was not sufficient evidence in order to obtain this instruction because the threat that was described in the testimony was of a future harm. Larry Gibbs Why isn't that a dispositive state court decision on the issue? Eric Menendez I'll try to explain why. Larry Gibbs We're supposed to second-guess the state court. Eric Menendez Absolutely. And that's what ---- I submit that is what this court's job is. And there's two reasons. Larry Gibbs I remember it was an oath. Eric Menendez State court judgments. Larry Gibbs There are certain cases, Your Honor, where that is permissible. And I would tell you this is one of them. And the reason is this. If you look at Bradley v. Duncan, which was the entrapment defense, and the state court gave reasons why it didn't want to instruct on the entrapment defense, and the case came here on habeas corpus, and the same issue was raised. And if you look at what happened in Bradley, they said, look, there is a federal right to instruction on theory of defense. Now, what that defense is is a matter of state law. Some states have entrapment, some states don't. But if the state gives you the right to an entrapment defense and you put in substantial evidence, enough for the jury to consider it, you have a federal right to instructions on that theory of defense. Now, once you accept that proposition, the court has no choice, it seems to me. They have no choice but to examine the basis upon which the state court refused to do that. And that's what they did in Bradley v. Duncan. That's the rule in this circuit. Now, there's another reason why that isn't dispositive, and this brings us to 2254, and in particular the decision in Taylor v. Maddox, which Judge Kaczynski wrote, and setting forth a framework for analyzing this kind of factual determination. And our position is that the state court's decision was an unreasonable determination in light of the facts of the case. There's two kinds of factors to look at. One is, did the state court, when it made that factual determination, overlook crucial, material, important evidence? The other is, did they misapprehend the law when they were in the process of making that factual determination? Both of those things are true here. The state court, if you look at what they said, Judge Trump, when they ruled that it was insufficient evidence, they said the only evidence we have to support this defense is that Eric Menendez was afraid his parents were going to kill him, number one, and number two, Lyle Menendez looked pale and wan, and that's an insufficient basis. You cannot read this record and come to the conclusion that that was the evidentiary basis upon which the defendants sought the instruction. You can't do it. It's wrong. The state court neglected to consider four categories of important facts. They neglected the history of the relationship, of which there was substantial testimony, sexual abuse for 12 years, Mr. Menendez threatening Eric that if you ever disclose this, I will kill you. Not only will I kill you, I'll tell you how I'll kill you. I'll put you in a chair, I'll tie you up and I'll beat you to death. It overlooked the fact that there were several confrontations four or five days before the brothers talked about it. Lyle confronted his father. His father said I can't let this happen. It overlooked the fact that there was a confrontation the night of the shooting when Lyle said you're not going to molest him anymore. And then it overlooked Eric's testimony. But, you know, these were adults. And they could have just left the house and never come back. I mean, as I'm so seeing it from the perspective of the state court, I say, look, you have to show, you know, sure, there were children. They didn't have any place to go. They couldn't, you know, there was basically no escape. They had to keep coming back. Then even if the threat was not immediate, nobody pointed a gun at you, if you have to get back to the house because you basically have no place to go, then whether the threat is today or tonight or tomorrow morning or in two weeks, it doesn't matter because you are tied to the location. But it's different. These are adults. Eric was, what, 18 and Lyle was, what? 20, 21. Your Honor, what you're saying is that They are able to go to San Diego, you know, have some of the wherewithal and money and to get guns under a false ID. Why couldn't the state court reasonably say, look, in these circumstances, since they don't claim they mistakenly saw their fathers pointing a gun at them, you know, they mistakenly and reasonably thought their father was about to pull the trigger, then they'd have merit showing. But saying, we think we're going to get killed on schedule tonight when they have a perfectly good, you know, escape hatch. Just get in the car and drive away and never come back. That's not enough. It's a little hard to Well, Your Honor, what you say is perfectly reasonable. And if these defendants were putting on a defense of perfect self-defense, I would say to you, we're done. I mean, it doesn't work. This is unreasonable self-defense. By definition, what they did was unreasonable. I mean, that's that's the whole point. Now, you know, this is not, you know, this is not the first time this circuit and certainly not the courts of California have dealt with a situation that is unreasonable like this. Take, for example, Kelly DePetris, DePetris versus Kuykendall. Case out of the circuit is a woman, a battered woman, who shot her husband at the door. She was an adult. The fact is, is what she did was unreasonable. But that's the defense. And Brenda Harris in the state of California, it's the same thing. It's an unreasonable self-defense. She shot her husband while he was sleeping. She got the instructions. Now, let me tell you, you know, we're already, you know, they're already in a better position than my client is because Mr. and Mrs. Menendez were not as far as they knew sleeping. As far as they knew, my client knew there were guns in the house. There had been prior threats of death. So we are way on the other side of DePetris. We're way on the other side of Harris. But it is, by definition, unreasonable. Now, you can posit certain circumstances where it's... Was there actual evidence of guns in the house or did the defendants simply say they... No, there were guns that were found, two rifles that were found in the house. And there was evidence of that. It isn't just them, the boys... No, that's correct. I'm sorry. Go ahead. You have a minute. Any other arguments you'd like to touch on? There are many, Your Honor. I'd like to touch on the prejudice argument with respect to the instruction because it's something that we've been debating with the state. And what this error of not permitting, not having the jury consider this defense at all was rendered harmless by these other verdicts. And it brings to mind the Oliver Wendell Holmes statement that the life of the law is not logic but experience. And we have experience in this case on this issue, what happens when the jury is instructed on imperfect self-defense. And that's the first trial. It's undeniable. In the first trial, six jurors were prepared, did vote, for imperfect self-defense. I'm hearing basically the same evidence, certainly the same evidence from my client. This is the same sort of situation that this court dealt with in Bradley v. Duncan, where there was a prior trial where the jury was hung and they came back and evaluated the prejudice. And they said, you've got to look at that prejudice analysis to focus on what happened in that first jury because that's the experience. Now, there's some logical flaws in what the state court also said about the verdicts rendering the error harmless. I'm not sure I've got enough time to go into that without the Brooks. But, Your Honor, will I have time on rebuttal to... I'll give each a minute for rebuttal. Two minutes? I'll give you each a minute. You and co-counsel. Each of you will have a minute. Okay, we'll have to fight over that minute. No, no, you each get your own minute. Thank you. I see I have 49 seconds. No, you don't. I'm out? I'm 50 seconds over? You're not eating interview. Maybe we could come back after lunch. All right, thank you. We'll hear from the state now. Good morning. May it please the Court. Deputy Attorney General Kenneth Byrne on behalf of the respondents in this case, the wardens. I'd like to briefly touch on each of the issues that were discussed here this morning. But before I do that, I'd like to briefly rebut Mr. Gardner's contention that AEDPA does not apply because the state court of appeal did not expressly reject the federal claims. We strongly disagree with that contention. In the opening brief that was filed in the California Court of Appeal, each of these issues was clearly identified as both a federal and a state issue. And when the California Court of Appeal resolved each of these claims, sometimes it cited federal law, sometimes it cited state law. It never said that we're rejecting this claim under state law only. And, for example, I don't remember that they ever said that under federal law either. The claim is that you didn't address the federal right to have a psychiatrist, which includes the rights to confidentiality in the communication of a psychiatrist. Can you point me to the place in the state court opinion where you think that's addressed? No, Your Honor. The state court did primarily resolve that issue as a matter of state evidentiary law. You know, primarily is a weasel word. Well, I guess it is. Give me the part that's not primarily, that's secondary. I think it was a substantial rejection of the federal constitutional claim, Your Honor. Substantial means they didn't talk about it? Yes, Your Honor. The issue was raised in the petition for review, which the California Supreme Court denied on the merits. So, no, there was no express discussion of the federal. You're really not disagreeing with opposing counsel. They didn't really talk about it. What you're saying is we must assume that they did resolve it because by not saying anything about it, they must have decided it. Correct, Your Honor. And that's what the federal courts assume all the time in the silent denial context. For example. I don't remember we assumed that in Maddox was Taylor v. Maddox. In Hunter. I didn't realize you had disagreements with Taylor v. Maddox, but the Supreme Court denied cert, so I guess. In Hunter v. Espero, Your Honor, this Court said that the denial of a claim without discussion is deemed to be on the merits. That's a decision from this Court. And when the state court evaluated. Does that involve a postcard denial from the California Supreme Court? Yes, it does, Your Honor. Isn't that a little different? I don't see how, Your Honor. The point is that a claim has been presented to a California state court, and you have the denial of a claim. There were, for example, there were federal cases cited in the Ozeal tape issue. The Lindy case, a decision from I believe it's the Second Circuit. In any event, not to waste your time on this. The bottom line is the Court of Appeal in its inch-thick opinion does not discuss it. And we have to infer that it did really resolve it because it must have done so because it was presented. Yes, Your Honor. I think we understand your position. Thank you, Your Honor. Nothing to be gained by spending more time on it. Thank you. I'd like to briefly discuss the factual finding that the state trial court made in which the California Court of Appeal adopted, as did the district court. And this is an area where defense counsel and I do disagree on. The finding was that this December 11th session with Dr. Ozeal was for the purpose of therapy. That was the factual finding that was made under AEDPA. Different from the factual finding made by the Court of Appeal years earlier when it had said, oh, no, this was clearly for purposes of defense. That was the California Supreme Court. That was the California Supreme Court that held that, Your Honor. And the writ proceedings, the mandate proceedings in the first instance. It was the California Supreme Court. Yes, Your Honor. That was the finding of that court based on the showing that was before it then. In the second trial, we had further proceedings on that issue. We had additional testimony, and there was a different showing. And the state trial court made the same finding it made before. What's important was that — I think it was the California Court of Appeal. In fact, I looked it up. It was a same panel. And we even had an overlapping judge. Same division. Yeah, here we go. Court of Appeal, Second District, Division V. It starts with 337. Is that it? 337 of the excerpt, Your Honor. Yeah. Ashby presiding — presiding justice. I don't think Justice Ashby was ever on the California Supreme Court. 337. It has a big caption here. It says, Court of Appeal, Second District, Division V. I assume you don't think that's the California Supreme Court. No. The Court's correct. I know this issue did go to the California Supreme Court. It may have been on a different issue. Well, it may have been on a different issue. The California Supreme Court may have something to say about it. My question concerns the contrary statement by the same division of the Court of Appeal several years earlier where it said, in the Medeiros petition, it said the visiting psychiatrist was for purposes of defense, not for purposes of treatment. Yes, Your Honor. So which of these findings do we accept as final? Your Honor, the one that was the later decision that gave rise to the conviction in the second trial, which was never reputed by the state court. So you have one set of rules, and then you have one trial, and they don't succeed in the conviction. They sort of change the rules, and they even change the facts. That happens all the time, Your Honor. In fact, Judge Weisberg, at the start of the second trial, said, look, you know, there were a lot of rulings from the first trial. I'm sorry? You changed the judge? The same judge? Judge Weisberg was the same judge in both trials. He presided over the first trial. At the start of the second trial, he said, look, you know, a lot of the rulings from the first trial. Isn't that a little distasteful that when the state doesn't succeed in convicting somebody on one set of rules, it sort of changes the rules dramatically? I'm not quite sure what the court means when you say change the rules. There were additional proceedings. I was about to tell you. You had two juries. Now you have one. You gave a defense instruction that is now denied for imperfect self-defense, thus finding that this thing is for, that he was a psychiatrist for purposes of defense, and now the rule is that they're visiting him for purposes of treatment. It looks to me a lot like, sort of like, gee, we didn't succeed in nailing this guy, so we can't do it fair and square. We'll try to sort of jimmy things and see if we can't get a conviction some other way. Well, I really respectfully disagree with the court's characterization of what happened in this case. I don't care whether you disagree or not. Your job is to persuade me, so why don't you persuade me? Your Honor, first of all — I am convinced you don't view it that way. You don't have to reiterate that to me. First of all, Your Honor, the prosecution at the second trial was different from the prosecution team at the first trial. They had the benefit of seeing what happened at the first trial. At the first trial, a lot of the evidence came in without objection, and the prosecution team at the second trial, with the benefit of reading back over what had happened, said, gee, a lot of this is objectionable. Maybe we should try to keep it out. A lot of it came in. You know, when you read the defense briefs in this case, one gets the view that, you know, these defendants basically were hamstrung by all these arbitrary rulings. The defense case was two months long in this case. Eric Menendez had two mental health experts who testified, one in Cerebro. Nobody in the second case heard about the molestation that was claimed to have happened when Lyle was 6, 7, and 8 years old, right? They heard about the alleged molestation of — Why don't you answer my question? No, that's true. That's true, because Lyle did not testify. Why not answer my question? Why give me something else? Well, Your Honor, because Lyle's testimony — I asked you a question. Yes, Your Honor. Okay, and what's the answer to your question? The question is that because Lyle did not testify in the second trial — Did he — did they hear about it in the second case? No. No. Not about Lyle. They proffered evidence on that point. Yes, and the trial court excluded it. Okay. Under State law, because there was no foundational showing. Given the fact that Lyle testified in the first trial and did not testify in the second trial, he was not allowed to bring in matters which were tangential to any evidentiary issue that was before the jury in the second trial. You think that when the claim is that these boys have been — Now, I don't know if it's true. I mean, I'm highly skeptical of his defense. But the defense is that they have been molested and oppressed their entire lives, sexually molested and beaten their entire lives, and therefore, because of that years-long treatment, they get into a fit which is unreasonable and see things in an unreasonable way. You think that what happened, that sexual molestation by the father between the age of 6 and 8, winds up being irrelevant? Your Honor — I have trouble seeing that. The jury heard evidence of sexual molestation of Eric in the second trial, Your Honor. Not of Lyle. No, not of Lyle. Not of Lyle, but of Eric. Andy Kano, who was one of the defendant's cousins, testified at both the first trial and the second trial that when he was younger, Eric, not Lyle, but Eric, told me that his father had been molesting him. That evidence came in at the second trial. Other witnesses who would have been cumulative at that point were excluded. None of it came in as to Lyle at the second trial as to the sexual abuse. There were a lot of witnesses, though, who testified as to both brothers that the parents, Mr. and Mrs. Menendez, were bad parents. They were too strict. They were abusive. They yelled at their children. They belittled them. When Eric fell off his bike, his father wouldn't put a Band-Aid on. I mean, that stuff came in in droves in the second trial as well as the first. Admittedly, a lesser volume of it. Judge Weisberg said in the first trial there was a lot of cumulative stuff. The first trial got out of hand. He said the second trial, I'm going to keep a narrower focus on what the defendant's mental state was at the time of the murders. The thing about the prior sexual abuse is you have to keep in mind the state trial court's refusal to give the standard instruction on perfect self-defense was hinged upon its finding about imminence, which is a state law issue. What the court found was that there was no threat of imminent harm. In fact, Eric at the second trial, Eric Menendez at the second trial, expressly admitted that he knew that any – It judged imminence by a reasonable standard, which is a little bit difficult to – it's somewhat incompatible with the idea that this is unreasonable view to begin with. If the claim is, look, we realize any reasonable person wouldn't think that the harm was imminent or inevitable, but we thought so because, you know, slightly deranged because of this experience. I don't know. Your Honor, the California standard jury instruction expressly says that the threatened harm, the perceived harm has to be imminent because of the high degree of value that California law places on human life and the reluctance to allow people to use lethal force. Eric Menendez admitted at the second trial that he knew that any future harm was in the future, any threatened harm was in the future. Those were his words. If you look at the – What about the use of the tapes? I mean, that's another thing that changed in the second trial. The prosecution put in psychiatrist tapes, made a big deal out of them, said this is a smoking gun. That's another change. It was a smoking gun, Your Honor. It showed that the defendants premeditated this murder, these murders. How do you take tapes that are used by the defendants to get psychological advice for purposes of preparing the defense and use them for the prosecution? How do you reconcile it with AIC? Well, I'm going to say that that question is easy to answer. So common decency. Well, I'm going to say that that question is easy to answer, and I'm sure the Court's going to disagree with my answer on that. They waived the – Well, why don't you give me a difficult answer that I can be persuaded by? They waived the psychiatrist therapist – the psychiatrist patient privilege, Your Honor. They tendered their mental states. They waived that under State law. When did they do this? When they tendered the defense that they did, which was our state of mind was what caused us to act the way they did. They tendered that at the first trial. They tendered it at the second trial. That – So you mean when you claim that your mental state is in dispute, then the state can seize all communication with the psychiatrist at higher to help you prove that you are in fact insane or whatever the mental state is. That's the position of the state of California, that whenever somebody says – claims, for example, not guilty by reason of insanity, that's great. You get a psychiatrist, but we get the tapes. In fact, we get to put the policeman in there to listen while you are talking to the psychiatrist, a detective to take notes. Your Honor – That's really your position. Well, Your Honor, I don't – I'm not taking a position on that question because it's not – No, I think you just did. It's not before – I think what you said is they waived it by putting the mental state in issue. That happens whenever a defendant raises insanity or incapacity or any kind of mental state as a defense. Okay? Which is the only circumstance in which you really get a psychiatrist under ache. So by your theory, by your answer, by your position, whenever you claim a defense which entitles you to a psychiatrist under ache, we get the tapes. Your Honor, I didn't – Because the right has then been waived. I'm not going to make that statement here, Your Honor, because that issue – I think that's what you said. Well, I think that's probably true, Your Honor, but this issue has not been briefed in this court. Well, I think that was your answer. You said I was going to disagree with the answer. Well – You were going to give it anyway. There was a finding that the psychiatrist patient privilege was waived. There was a finding that – Did I misunderstand your waiver argument? No, you didn't, Your Honor. Because that's the position you're taking. That's the position. Whenever a defendant raises the kind of defense that would require him to see a psychiatrist, by raising that defense, he waives any communication with a psychiatrist. That's my understanding of the law, but that's not – That's your position. Well, I don't have to take a position, Your Honor, because I didn't – I asked you a question, and you said I'm going to give you my position. You're going to disagree with it. I know that is a fact. And you said waiver. So is it your position that it's waived? Yes, Your Honor. It was waived, and that finding was never challenged. That finding has never been challenged in any court. Where was the finding? The State Trial Court made that finding, and that is mentioned in my brief. Your Honor, if I could direct the Court's attention to pages 67 and 68 of the excerpts of record, specifically the Court of Appeal opinion. Okay. I'm there. If you look at the last paragraph, the last sentence of the paragraph that ends at about the top of the page on page 68, we believe that the logic of Garot and Clark to be sound, and that the trial court properly found a waiver of the psychotherapist's patient privilege. Who is who? Beg your pardon? Who is the we? California Court of Appeal, Your Honor. And if you'll notice – I'm sorry. This is from the California Court of Appeal decision? Yes, Your Honor. I thought you were going to read me from the trial court decision. Well, Your Honor, there was no written trial court decision on this. The Court of Appeal incorporated by reference the State Trial Court's finding. If you look at page 67, Your Honor, of the excerpts, subheading C is the psychotherapist's patient privilege. That's not the issue that's before this Court. The issue that's before this Court is the one that I think is addressed subsequently, which is the attorney-client privilege. And that was, I think, made pretty clear in the COA that this Court issued. The psychotherapist's patient privilege is not before this Court. How do you link up this purported waiver or the finding of waiver to the AIC or ACAE? Well, I would say ACAE decision. Oklahoma, they probably wouldn't. But how does that link get made? Why does – because this has been put in issue, why does the confidentiality, which is what the defense seeks to infer from AIC, go on as well? I don't think that the waiver applies so much to the AIC claim, Your Honor. I think that the basis of the rejection of the AIC claim is that the purpose of the consultation with Dr. Ozeel was not to prepare a defense. It was to obtain therapy. That was the expressed factual finding of the State Court. And that ruling was never challenged. We just wasted 10 minutes over nothing. My question was about AIC. You give me this whole waiver argument, which is a detour, and then when Ms. Clifton asks you the question, you say waiver doesn't apply to AIC at all. Why did we just have this whole conversation? Well, I thought I was trying to answer the question, Your Honor. If I did a bad job, I apologize. You think I was asking you about the State psychotherapist patient privilege? Yes, Your Honor, I did. Even though nobody briefed us here? Yes, I did, Your Honor. You know, my accent must be worse than I thought. Your Honor, in the brief time that I have left remaining to me, I'd like to briefly discuss the imperfect self-defense issue, and specifically the question about whether there's a right to have a State-created defense be the basis of a jury instruction. And there was some discussion earlier about this Court's holding in Bradley v. Duncan. I'd like to respectfully refer the Court's attention to the Supreme Court decision in Gilmore v. Taylor, which is a Teague decision. Excuse me, a Teague decision? Yes, Your Honor. The holding of Gilmore was a Teague barred relief. There's no retroactive rule that could be used by the defendant in that case. Well, you can't rely on circuit precedent for purposes of Teague. I beg your pardon? You can't rely on circuit precedents for purposes of Teague. Yes, Your Honor, but I would. There are plenty of perfect precedents that say that once, particularly from our circuit, that say if you're entitled to an instruction supporting your theory of defense. Your Honor, I think that there are holdings that say that. In the Gilmore v. Taylor case, though, the holding of that case was that outside of the capital context, and this is a quote, we have held that instructions that contain errors of State law may not form the basis of Federal habeas relief. No, I know what Gilmore says, but Gilmore basically says, look, we're not going to get into parsing the precise wording of State instructions because that's a tricky thing. You know, every time State court gives an instruction, somebody can say it's a better instruction. But this is not this case. This is a case where they simply did not submit this issue to the jury. The jury was not instructed in a way they could find on imperfect self-defense. They didn't do a bad job of instructing it. Simply refused to give the instruction. That's correct, Your Honor. I don't think Gilmore applies. Well, I respectfully. Your argument that CalJIC 517 requires imminence and there wasn't any to show a predicate for this defense. Is that your argument? Yes, Your Honor, and that was the express finding of the State trial judge and the California Court of Appeal and the district court as well. I'm pretty much out of time. In closing, I would like to say that in this. Why did the judge give it in the first trial? I think he made a mistake, and I think he recognized that. You recognized it when the two jurors came back with splitting six to six? No, Your Honor. I respectfully disagree with the suggestion that the State trial court tried to, you know, secure a conviction in this case. I think that the only inference that can be drawn in this case is that the judge tried to do the best he could to apply the law to the facts of the case. Sometimes judges change their minds as cases unfold, and I don't. I think that. They never read the newspapers. Your Honor, if the court is suggesting that Judge Weisberg tried to jimmy the second trial, tried to jury-rig the case to obtain a conviction because he read articles about this in the paper, I just have to disagree with that suggestion. We'll never know, will we? Well, Your Honor, I respectfully disagree with that as well. There was a judicial bias claim that was raised in the California Court of Appeal. Part of the argument there was Judge Weisberg must have read the papers. There was national outrage at the first trial that these defendants who admitted committing the murders, that they got a hung jury. So, therefore, it follows logically and inextricably there could be no other possible conclusion. Judge Weisberg must have been biased. Well, that claim was rejected by the California Court of Appeal. It was rejected by the district court. And it wasn't even raised in this court. So I do disagree. I think that there is a basis to infer that Judge Weisberg was not biased, that he was trying to preside over this trial. I would hope in the same way that any bench officer in this country would do, which is in a fair and impartial manner. And I think that because there were different rulings. I'm more convinced of that if Judge Weisberg weren't facing election every four years. But, anyway, that's not before us. Well, Your Honor, I don't think anybody has run against Judge Weisberg, and I don't think that he was – I don't think that he was – I'm sure Judge Gettleman felt the same way until he issued his ruling. Judge Gettleman? Alfred Gettleson. Oh. Gettleson, thank you. Well, Your Honor, I just – I don't think anybody ran against him either before he issued his unpopular ruling. But, anyway – Well, Your Honor, I just – the last thing I would like to say is that I disagree with the suggestion that Judge Weisberg jury-rigged this case in the Court of Appeals. I'm sure you and I would have disagreed, not for the last time. The Court of Appeals did make a finding on this. The Court of Appeals decision is in the excerpts of record. But is it an issue that Weisberg jury-rigged the case? I'm sorry? It's not before us. Correct, Your Honor. I'm sorry, Judge Trent. Never mind. But it is – there is a lengthy discussion of this. Laiteke? Laiteke is a Supreme Court decision that says that a ruling from the bench can almost never be the basis of a judicial bias challenge. So there's a pre-court precedent for that as well. Reed Summerlin. Summerlin v. Hayes, Your Honor. Thank you very much for your time, Your Honor. Good morning again. I only have one minute, so I will necessarily be brief. I will make two points. Judge Kuczynski, you asked a question. You noted there were inconsistent findings, one by the trial court that said this was for the purpose of therapy, and one by the Court of Appeals subsequently that said, and I quote, Petitioner's primary objective was not to receive therapy, but to provide themselves with a possible – I thought there were two findings by the Court of Appeals that are inconsistent, by the same division of the same Court of Appeals. Yes. And then subsequent to that, subsequent to the finding I just read, there was a finding by the same Court of Appeals that, indeed, this was for therapy and not for – That was based on Judge Weisberg's finding also. These were all based on Judge Weisberg's finding. And his findings didn't change from one trial to the other. And your question was, which one should we pick? And while there are conflicting factual findings, I want to make sure the Court understands my position, which is, it doesn't matter. It doesn't matter what the petitioner's purpose was in the meeting, because that's not what AIC is about. If it did matter, what we would see across the country when anyone requested a psychiatrist was, Your Honor, I want a hearing. I know why his defense lawyer wants the psychiatrist. He wants help with the defense. But I want to find out why this defendant wants it. And if he says the wrong thing, Your Honor, the statements are mine. And we don't see hearings like that because it doesn't make any sense. That's not what AIC was about, especially since AIC is designed to deal with people that are mentally ill. We cannot hinge the confidentiality of statements made to a psychiatrist on the subjective motives of someone who's mentally ill. Do you have a constitutional right to a psychiatrist on the issue of diminished capacity? You know, I don't think there's – you could go issue by issue. I think you have a constitutional right to a psychiatrist that's going to assist you in representing the client in a particular case. Now, if in a particular – The reason I ask that is what I asked before. And Marshall says the issue in this case is whether the Constitution requires that an indigent defendant have access to a psychiatric examination and assistance necessary to prefer an effective defense based on his mental condition when his sanity at the time of the offense is seriously in question. Yes. And I don't think you can look any – That's the only question that AIC or ACAE – Well, I don't think AIC has been interpreted as narrowly as that, Your Honor. I think if you look at the way AIC is interpreted, including Smith v. McCormick, it wasn't an insanity case, and yet it was an AIC claim. I don't think – in fact, I don't think there's an authority in the country that has suggested AIC is limited. We're only going to give you a psychiatrist if you raise an insanity claim. That's never – and it's never been the State's position here. The second point I'll make, you asked about the evidence that was excluded from the trial. Your Honor was referring to Diane Vandermolen, and she was the 19-year-old cousin of Lyle. When Lyle was 8, he came down one summer evening and he said, I don't want to sleep in my room. Can I spend the night with you? My dad is touching my genitals. And that's what was excluded from the second trial. And counsel suggested that overwhelming evidence came in. He pointed out that once Eric's dad didn't put a Band-Aid on him after he fell off a bicycle. And that did come in. But that isn't the same thing. I mean, their argument is that Diane Vandermolen's testimony was properly excluded because it was cumulative. And then the prosecutor turned around in a closing argument and said, there's no evidence ever that sexual abuse took place. Well, there was. And there was in the first trial. And that's why it was hung 6-6. And that evidence was excluded. That's the evidence Your Honor was referring to. So I know I'm over my minute. Your minute is more than up. Thank you, Your Honor. Thank you for your patience. I just want to briefly address a remark Judge Trott made. If the state court ruling on a jury instruction is dispositive, you might as well take this federal guarantee that has been ruled out in the circuit many times, crumple it up, and throw it in the garbage can. Because as soon as the state court says this is the state of the evidence, you don't get the instruction, there's no federal review. That can't be.  The trial court in this case made the unprecedented decision for a trial court to look at it and say, that's not the law. Now that instruction, 5.17, which provides for unreasonable self-defense and based on entirely subjective basis, entirely subjective experience of the defendant, the trial judge said that's wrong, that's not the law, I'm going to change it. I'm going to inject an objective element into that. Now that brings us to Taylor v. Maddox. The judge, the trial judge, has at that point made its factual findings with a misapprehension of the law. That's not the law in California. The California Supreme Court. Calgic, the instructions in Calgic aren't law. They simply try to, there's a group of people, as you well know, who get together and try to figure out a way to express the law in lay terms. And I think even Calgic recently has been dumped, hasn't it, these versions? In another attempt to try to make it even easier. I don't know. Westlaw still says we want to pay $50 every six months for mine. So if it's, you know. I've been through so many rewrites of Calgic, you can't even believe it. All right. Now, you're absolutely right. Calgic is not the law. However, when the California Supreme Court embraces Calgic and approves that instruction, that's the law. But it's eminent part of the law. Eminent is part of the law. But it's eminent. But it is not an, you don't look for objective, objective corroboration. Do you get an imperfect self-defense instruction when the evidence is, I thought he was going to kill me 10 years from now when I grew up and got old enough to be his rival for my mother's affection? That's the future. And that's, and the question, obviously, is that too far in the future? It depends whether he imagines he's tied up with a chain so he can't leave the house. If he imagines that. It's a very interesting problem, Your Honor, whether delusions, somebody who is delusional can get an imperfect self-defense instruction. And at the time of this trial, the answer was yes. People v. Uriarty, California court appeal case said somebody who is suffering delusions and believes, for example, you know, that it was some situation like this where it was completely unreasonable. That still is a basis for the defense. Why? Because that person is. If the delusion is reasonable. If the delusion is reasonable. I mean, if I believe, you know, that the CIA is going to send the plane for me and put me in the rendition program and take me to Egypt. It's not? It's not. I hope not. So I'll keep talking. But the reason it doesn't matter that it's delusional is because the defendant is less culpable. And that's built into the law of malice. Malice requires unlawfulness. Unlawfulness requires that you're acting outside the bounds of the law. You think you're acting within the bounds of the law. You're delusional. That's why it's covered. Now, you know, you can make up these hypotheticals. And believe me, we've made up many in the last couple of weeks about this. We are so far on the other side. We're on the other side of Kelly to Petrus. We're shooting a sleeping man. Brenda Harris shooting a sleeping man. I mean, talk about imminence. We are way on the other side of that. And so what I think is really going on in this case, and I'll close now, Your Honors, is this is about distrust of the jury system, the way this worked. You take away the only defense a defendant puts on. That's distrust of the jury system because we can't trust them. They were snowed the first time. And you look at Christian as the California Supreme Court decision interpreting the imperfect self-defense, the defense. They say whether the defendant actually held the required belief is to be determined by the trier of fact based on all the relevant facts. And then they say it's not required to accept the defendant's bare assertion of fear. Well, obviously, that presupposes that the defendant's bare assertion of fear, which we had far more of, goes to the jury. We have to trust the jury. That's what we do. We trust the jury. And they didn't do that in this case. Thank you, Your Honor. The case is now submitted. We are adjourned.
judges: Kozinski, Trott, Clifton